Thank you, Your Honor. Good afternoon. May it please the court. My name is Daniel Kaplan. I'm representing the appellant Francisco Hernandez-Barreras. I will keep an eye on the clock and I'll try to save about two minutes for my rebuttal time. The first issue has to do with a change that happened to the sentencing guidelines in 2011. The Sentencing Commission had noticed that it had become essentially routine for judges to impose a supervised release term on deportable aliens, 91% of the time, in fact, even though the Commission realized it was, in their words on the amendment, generally unnecessary in those cases. Generally unnecessary because those defendants were almost certain to be deported, and if they came back unlawfully after being deported, they were going to be charged with a new reentry, they would have a new sentence, and it would basically be meaningless to give them a supervised release term in those types of circumstances. And so they added subsection C to 5D1.1 of the guidelines, and subsection C says ordinarily, in those cases, it's not necessary to impose supervised release where the defendant likely will be deported after imprisonment. Now, in terms of exactly how to apply that, one of the most helpful precedents I find in published decisions is the Fifth Circuit's case in Dominguez-Alvarado, which both sides have cited in their briefs, which suggests that a defendant who wants to challenge failure to follow 5D1.1c should explain or argue that there were no unusual or uncommon facts or circumstances that would take it out of the ordinary case and justify an exception to that direction from the Commission. The argument here as to why this takes it out of the ordinary is that he has substantial ties to the United States, and the last time he was removed, he returned almost immediately, and the likelihood of his returning in the assessment of the sentencing judge is extremely high. Is that enough to take this case out of the category of an ordinary case? It is not, Your Honor. In fact, I would submit to you that those circumstances in this particular case put it very much exactly in the heartland of the ordinary case. This is an absolutely ordinary case, or maybe a less egregious case, and I would point to some statistics. In my reply brief, I cited a Sentencing Commission report on illegal reentry cases called Illegal Reentry Offenses, and some of the statistics in there are, for example, that the average number of times that an illegal reentry offender had been deported was 3.2. My client, two. They also noted that 38% of illegal reentry defendants were deported after a prior conviction for illegal reentry. My client, zero prior illegal reentry convictions. He had been removed twice, but he had no prior illegal reentry convictions. As far as the family in the United States, I cited a district court case that said it's quite common for these defendants to have family in the United States. Of course, it makes perfect sense that illegal reentry defendants have family in the United States, because that is very commonly the pull that brings them to re-enter illegally. So were we wrong in Valdivinos-Torres? Because there, we said that the district court gives a particularized explanation, and then we specifically approved of an explanation that was related to the defendant's family ties. We said that would be enough. Were we wrong to say that? No, family ties per se can be inadequate justification. But there were other, but I just want to make one point about the family ties in this case. In Valdivinos-Torres, the defendant himself filed a brief and said, my family ties in the United States are extensive and close. Those were his words, extensive, close family ties. So out of the horse's mouth, so to speak, he made that assertion. In this case, my client had a wife and two children who were not his children. They were effectively stepchildren, who by the time of this case were 22 and 21 years old. They were not small children. He re-entered illegally in 2006, shortly after he was deported in April of 2006. So probably sometime in 2006. At that time, his children would have been eight and his stepchildren would have been eight and nine years old. Now he has two grown up stepchildren and a wife and one brother in Arizona. He's got five more brothers in Phoenix. So in terms of how compelling someone's family ties to the United States must be, my client's family ties to the United States essentially boils down to his wife. I mean that the stepchildren are not his children and they're grown. The that's it. And he's not somebody like Valdivinos Torres, who in his own words says, my family ties here are extensive and close. So I don't, I mean, I'm not sure I follow that argument because we have this conduct of him coming back and these are his stepchildren, but everything from the record indicates he's raised them. So I don't know how we just sort of brush that aside and say, these are less important family relationships. Well, I'm not asking you to brush them aside. I'm asking you to weigh how, whether that takes this case out of the ordinary case that the guidelines tell us to look to. Does that make this case extraordinary? Does that mean he has an extraordinarily strong pull to come back for those children? And the fact is he had a strong pull when they were eight and nine years old, perhaps to support them and to raise them, as you say, but when they're 22 and 21, they don't really need their stepdad to support and to raise them anymore. So I'm just asking the court to take that into consideration in assessing whether that would be something that makes this an extraordinary case rather than the ordinary case. Do we have any information that we can either have in the record or of which we can take judicial notice as to how often the supervised release is given by the district court in Arizona? My sense from what the district judge said here is that this is fairly routine. You know, it would be very helpful to have that. And I would like to see if there's a way to get that information. My personal impression is that it's done basically as the court said, it's generally done. I don't recall any case where it wasn't done. I think it's just a reflexive move by the district judges in our district. And that is what the district judge said. He said, you know, generally we do this because it gives deterrence. I'm taking the judge at sort of a face value. I mean, this is a good judge. This is a straightforward judge. I think he's just telling it like it is. Absolutely. He tells it like it is. And that's everything I know from my experience for 13 years in the FPD's office in Phoenix is that is how it is. It has long been done that way before 5D1.1c and still after 5D1.1c. It's just the reflexive practice of our district judges. I think I would like to save the balance of my time for a vote. Okay, that's fine. Yeah, let's hear from the government. Mr. Goldberg? You're still on mute. Sorry about that, Your Honor. Is that better? There we go. Good afternoon, Your Honors, and may it please the court. My name is Ben Goldberg, and I'm here on behalf of the appellee, the United States. This court should affirm the district court's imposition of the term of supervised release, as well as the standard conditions imposed on that supervised release. And I'd like to first focus on Your Honor's questions related to this case's similarity to Belavino's-Torres, which is a published case out of this circuit. And I do think that the similarities between this case and the Belavino's-Torres case are quite striking. To start with, the familial ties are incredibly similar. In Belavino's-Torres, the defendant had his children in the United States, as well as an ailing mother. Here, Mr. Hernandez-Barreras has his two children, his wife, as well as a brother, as well. Furthermore- Do we know how old the children were in the other case? I'm not sure, Your Honor. I think some of the briefing may have indicated they were younger children, similar to the ages of Mr. Hernandez-Barreras' children when he first came into this country. But I'm not sure of the exact ages of those children. I'm not sure whether that makes enough of a difference. But as we look at human motivation, if the children are up and house and self-supporting, this is a very different proposition from the children who are in the house and need support from the parents, of course. I agree, Your Honor, although I think it is worth pointing out that in Mr. Hernandez-Barreras' sentencing memo at ER 29, he claims that he is still the sole provider for his wife and children. He doesn't use the past tense of, I was the sole provider when I came, but he says, I am the sole provider for my wife and children. And even at sentencing at ER 39, his counsel at sentencing said that the children were grown and may not necessarily still need his support. But it's not clear from the record or from the facts that we know that even though they're grown, his children don't still need his support. And I would agree with Your Honor that even if they did not need his support, I think the pull of the familial ties, given that the two children are here, given that his wife is here, as well as a brother, and the fact that he continued to stress the closeness of those relationships, that even if the children were fully grown and even if we were to assume that they might not need his financial support, that the familial ties are still enough here that the district court certainly was not abusing its discretion when it imposed the term of supervised release. I think there are also some other similarities between the two cases that are worth pointing out. For instance, the court in Valdivinos-Torres noted that Mr. was to be with his children and his mother. The same thing here with Mr. Hernandez-Barreras, who told the PSR writer in PSR paragraph 9, the reason I came back was to support my wife and to support my children. He made the same statement in his sentencing memorandum, as I already mentioned, at ER 29, when he stated that the reason for his return was to support his wife and children. And he said the same thing at sentencing at ER 40, when he told the judge that the reason that was to support his wife and children. The Valdivinos-Torres court stressed that point, and I think it's striking that... Can I speak? This is not your fault. It's hard to figure out when someone wants to ask a question. All the factors you are talking about seem to be genuine factors, and they will tell us at least some degree of accuracy information from which we can predict the likelihood that he might reenter illegally. So what we're supposed to do here is use these factors to figure out how likely it is he will reenter illegally? Is this what all these factors go to? Just an assessment of likelihood of subsequent illegal reentry? I think in this specific case, that's correct, Your Honor, because I think what the district court was looking at and what the court said at sentencing at ER 42 and continuing on to ER 43, was that the reason supervised release was appropriate was for the need for deterrence, which I think in this case, the need for deterrence would be to deter Mr. Hernandez-Barreras from reentering the country, given those extensive... Do we have any information that will allow us anything other than sort of a seat-of-the-pants judgment as to likelihood of reentry? Of course, we see illegal reentry cases all the time, and it's so common that I'm having trouble figuring out what would make someone more likely, so much more likely to reenter, that this is the unusual case. And the guidelines say it's got to be the unusual case. Well, Your Honor, I would continue to go back to the familial ties and then also the reason given by both the defendant in Valdivinos-Torres, as well as Mr. Hernandez-Barreras, for the specific reason for returning. So not only do we... And to go to your greater question of what can we look at, I think that's exactly what the court was trying to do. As Application Note 5 to 5D1.1c says is appropriate, is to consider all of those factors and try and come up with a determination whether this is a case that goes beyond the ordinarily language of 5D1.1c. I think what clinches it is what the court in Valdivinos-Torres said, that the familial ties are a legitimate basis for imposing supervised release. Those ties are similar to the same ties that we have here, and as I noted before, I think the reason given, the justification for returning, is what takes it to another step as well. That both the defendant in Valdivinos-Torres, as well as Mr. Hernandez-Barreras, both were on record as saying the reason they returned was to be with their family. Additionally, Mr. Hernandez-Barreras told the PSR writer that he returned shortly after his last removal, specifically to be with his family. I think that's another factor the district court can look at to determine whether, after this removal, was there another need, an added need for deterrence to prevent him from... Why does the government want supervised release instead of the possibility of just another conviction? Is it just that it's easier to reincarcerate the person than violate the conditions of supervised release? Is that it? Well, I think it does add another measure of deterrence, your honor. Certainly, there would be the additional prosecution of the 13... Well, but I'm trying to figure out why you want it. I'm not sure that, I mean, if you're going to prosecute him for coming back in, or if you're going to get him for violation of supervised release, the consequence for him is the same. That is to say, he's reincarcerated. Is it somehow, is it because it's easier for the government to go after somebody for violating the conditions of supervised release? I think it is. Is that right? Well, I think it is easier. I think you certainly could go after the terms of supervised release, but your honor, I would say the consequences are actually slightly different. If there was no term of supervised release and somebody returned, they would only be facing the new prosecution for 1326. And while they may face a custodial sentence for just that new prosecution, if you add on the supervised release violation, there is potential for those two sentences to run consecutively as opposed to concurrently. And I think there is an additional level of consequence when you add in the supervised release violation, which is, I think, what the court was trying to get at when it stated that it needed the additional deterrent measure. And I think adding those consequences helps to do that. Could you address the conditions here? Because we have a number of these conditions that I think doesn't the judgment say that they don't apply if you're not in the United States, rather than leaving the defendant to guess what he is or is not supposed to comply with after being deported? Well, your honor, it's true that the written judgment, at least in terms of the standard conditions, is silent as to whether it would be applicable upon deportation. There is language about deportation for the special condition, although certainly not for the standard conditions. I don't think, though, that there was no indication for Mr. Hernandez Barreras that these wouldn't apply if he were to be deported. At sentencing, at ER 42 and 43 and then ER 44, the judge clearly stated when he was discussing the first standard condition of reporting to the probation office that you must report to the probation office if not deported. Between that, between similar language showing up in the PSR, I think there was notice to the defendant that these conditions would not apply, the standard conditions, if he were to be deported. I agree with your honor that it would be clearer if that appeared on the written judgment as well. I don't think, though, that that lack of clarity rises to plain error, which is what we would need here to vacate those standard conditions. I would also just note in turning to those standard conditions that I do think that they were appropriate for the court to impose, as the government noted in its answering brief, in case the defendant were able to, however unlikely, maintain, to be able to continue to reside in this country or, however unlikely, if the defendant was able to return to this country. Given that, I think the conditions were appropriate and I think, as I just explained to your honor, that there was certainly no vagueness issue, given that the defendant was aware that these would not apply if he were to be deported. For all those reasons, I don't think there was error, certainly not anything that would rise to plain error for those standard conditions. Can I ask you just one factual question? Sentencing was last March. When does the one-year term of supervised release expire? It would be in less than a month, your honor. Supervised release would have started that day, if not the next, March 2nd or March 3rd, and so the term of one year is coming up in just a month. I see that my time just ran out. If there are no further questions, I would just ask that this court affirm the imposition of supervised release, as well as the standard conditions. Thank you. Okay, thank you. Mr. Kaplan, do you have a response? Thank you, your honor. I'd like to focus on Judge Fletcher's point about what makes a case unusual, and the government's argument essentially boils down to there were rational, reasonable justifications for the court to impose this. And that's fine as far as it goes, but it's not the issue here. The issue is, is this not the ordinary case? Is this an extraordinary case? And it's really not. And Judge Fletcher asked, well, what would make it extraordinary? And I'll give you some examples. Helpfully, Judge Fletcher does not look at unpublished opinions, but the unpublished opinions that are cited in the government's brief give us some examples of unusual circumstances. The Moreno-Cadera case, he had 28 prior unlawful entries, 28 to my clients two. The other cases that the government cites, the memorandums involve prior re-entries numbering no lower than seven, all the way up to many double digits with a maximum of 28. Another example is have somebody who was given, and this is a major distinction from Valdivinos-Torres, somebody who got an especially low prison sentence, a way below the guidelines prison sentence like Valdivinos-Torres did, and then this court said in Valdivinos-Torres, well, it can be a justification for giving supervised release in that instance despite 5D1.1c to sort balance that low prison sentence. Here, my client got 154 days, and the guidelines maximum was just a little bit higher at 180 days or six months. So this is very different from Valdivinos-Torres in that respect. Another thing you can have is serious criminal history. In the cases the government cites, the criminal history categories were no lower than category three, and they ranged all the way up to criminal history category six. My client, category one, he had zero criminal history points. And finally, there can be a situation of somebody whose family ties in this country are extraordinarily compelling, or even a case like Valdivinos-Torres where the defendant himself says my family ties here are extensive and close, or the Moreno-Cadera case again where the defendant's lawyer admitted in court my client's family ties here are so great he really should get supervised release. So those are some extraordinary. May I just ask one last question based on what government counsel said. If the supervised release term expires next month, is this whole case just about the next 30 days, or will there be some ongoing significance to your client to having been on supervised release? Does it matter once it expires? I do think the case will become moot when the supervised release term expires. And I agree with his assessment of when that will happen in about a month. So if we can't get our opinion out here within the next, or a decision out here within the next month, it's moot? I'm afraid so, your honor. And looking back, it theoretically might have been good to expedite, but this was the middle of pandemic and the government got one of those COVID extensions, and it was an unusual time. So I don't know how much difference that would have been. Are they capable of repetition, yet evading a review, except for mootness in criminal cases? I'm not aware of that in terms of an issue like this issue. If it were a challenge to the conviction, then of course it would not be moot. Right, of course, I understand that. Okay, thank both sides for an interesting argument, interesting case. Thank you. Thank you, your honor. United States v. Hernandez-Barreras, submitted for decision.
judges: W. Fletcher, Miller, Hunsaker